NOT DESIGNATED FOR PUBLICATION

No. 119,933

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of D.S. and K.S.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed June 7, 2019.
Affirmed.

*Anita Settle Kemp*, of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL, J., and STUTZMAN, S.J.

PER CURIAM: Separate cases from the Sedgwick County District Court concerning the care and welfare of two children, D.S., a male born in 2003, and K.S., a female born in 2006, are consolidated for this appeal. M.M. (Mother) appeals the June 2018 order of the district court that terminated her parental rights to D.S. and K.S. The father, B.W.S., (Father) relinquished his parental rights in May 2016 and is not a party to this appeal.

Mother argues generally that there was not clear and convincing evidence that she was unfit and unlikely to change in the foreseeable future. Specifically, she challenges the district court's use of a "stipulation to present unfitness" that she had signed two years before the termination hearing. For the reasons detailed below, we affirm the district court's findings and conclusions.

1

FACTS AND PROCEDURAL BACKGROUND

On April 22, 2015, the State filed petitions to have D.S. and K.S. adjudicated as children in need of care. An officer of the Wichita Police Department placed K.S. and D.S. into protective custody due to their parents' drug use, neglect, and the unhealthy living conditions of the home, precipitating the State's action to open the cases. The following day, on April 23, 2015, the district court granted temporary custody of the children to the Secretary of the Department for Children and Families (DCF) for out-of-home placement. After an initial placement, Saint Francis Community Services (SFCS) developed a plan to place the children temporarily with their paternal grandmother (Grandmother) and required Mother to submit to drug testing and to have assistance to make her home suitable for the children. On August 6, 2015, the parents offered statements of no contest to the petitions. The district court found the facts in the petitions were true and were sufficient to support adjudication, and concluded D.S. and K.S. were children in need of care.

The State first moved to terminate the parental rights of both parents on November 9, 2015. In mid-July and early August 2015, Mother had been incarcerated for a probation violation. Upon her release, Mother attended a meeting with her case manager from SFCS, Jerry Pierce. Pierce observed that Mother had two black marks under her eyes and broken fingers. Mother admitted that there was still some domestic violence with Father but said she felt safe because Father was no longer welcome in her home. In September 2015, both parents were arrested following an incident involving SWAT intervention to apprehend Father who was a suspect in pending criminal cases. Mother was incarcerated from September 2015 to January 2016 for probation violations and her alleged interference with law enforcement officers.

On May 9, 2016, Father relinquished his parental rights at the hearing on the State's motion to terminate the parents' rights. At the same hearing, Mother stipulated to

her "present unfitness," and the other parties agreed to continue the case to allow her time to complete court orders and demonstrate stability. The parties also agreed that if the motion to terminate Mother's rights was again brought before the court for hearing, the State would only need to prove Mother's unfitness for the foreseeable future.

Considering Mother's stipulation, the district court found that clear and convincing evidence showed Mother was "presently unfit" by reason of conduct or condition that rendered her unable to care properly for D.S. and K.S. In support of that finding, the court stated consideration of these statutory factors: the failure of reasonable efforts by public or private agencies to rehabilitate the family (K.S.A. 2018 Supp. 38-2269[b][7]); Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the children's needs (K.S.A. 2018 Supp. 38-2269[b][8]); and Mother's failure to carry out a reasonable court-approved plan directed toward reintegration of D.S. and K.S. into her home (K.S.A. 2018 Supp. 38-2269[c][3]). In addition to affirming that prior orders remained in effect, the district court specified 12 particular orders and tasks for Mother.

Between July and November 2016, Mother received 13 sessions of individual therapy with Jennifer Hernandez, LCMFT, at Central Christian Counseling Center. Hernandez submitted a case update that was admitted as a State's exhibit at the final termination hearing. In the update, Hernandez reported that in the middle of that therapeutic relationship she became aware that Mother was "omitting important information as detailed in the court documents" that Mother's case manager provided to Hernandez. The documents referred to Father and an upcoming trial he was facing. Hernandez commented that Mother's lack of transparency made it difficult for her to assess whether Mother was able to see how her marriage could potentially have a negative impact on D.S. and K.S. Hernandez reported that Mother "exhibited little interest in processing the unhealthy marriage in detail with [Hernandez] and would most likely need long term therapy for her concerns."

Hernandez referred Mother to two agencies for that purpose, both of which provided services at very low cost, and notified Mother and her case manager about her referral. At the time of concluding her therapy with Mother, Hernandez recommended working on boundaries within the marital relationship so Mother could make healthy choices that would place a priority on her children and her. She was also of the opinion that reducing the codependency in the marriage would have benefitted the entire family. Mother did not resume individual therapy until August 2017—about eight months after she concluded the sessions with Hernandez—when she began therapy with Michele Meinhardt, LSCSW, at HopeNet, one of the agencies to which she was referred by Hernandez.

Pierce spoke with Mother in January and July 2017 about continuing therapy to address her boundary issues with Father. In January 2017, Mother told Pierce that she could place good boundaries with Father, and she understood he could not move in with her directly upon his release. In March 2017, Mother said that she had some financial concerns about therapy, so Pierce asked her to complete a budget and she committed to do so. Mother had not completed a budget by their next meeting, but she did so after the court ordered it. Mother later received a settlement from an accident that allowed her to pay her bills, fines, obtain her driver's license, and obtain two vehicles.

In April 2017, after a jury found him not guilty of aggravated indecent liberties with a child, Father moved in with Mother upon his release from jail. In May 2017, the district court held a permanency hearing. Mother was present, and Father was also present with appointed counsel, although he had relinquished his parental rights a year earlier. The district court ordered that any contact, visits, or therapy involving the children and Father would be at the direction of each child's therapist. The court directed Mother to begin "active involvement" in an appropriate individual therapy program until the therapist considered it was no longer needed or the court rescinded the order. Mother began her therapy with Meinhardt about three months later. By September 2017, SFCS

reported that Mother continued her relationship with Father, but the team and the court had discussed working with Father as Mother's significant other—even though he had relinquished his rights as a parent to D.S. and K.S.

In December 2017, SFCS learned Father was no longer living with Mother. In late November and early December 2017, he had been arrested and again was facing criminal charges. At the next permanency hearing, in January 2018, the district court ordered there was to be no family therapy or visitation between Father and the children. Later that month, Father pled guilty to various criminal charges, with sentencing was set for May 2018. In late February 2018, after a call from Mother to law enforcement, Father was arrested on outstanding warrants and for obstruction during the incident, which involved an extended standoff before Father surrendered to custody.

On April 6, 2018, the State filed an amended motion to terminate Mother's parental rights. The district court heard evidence on the motion on May 16, 2018. At the outset of the hearing, the State reminded the court that Mother had stipulated to "present unfitness" almost exactly two years earlier, and announced the State would proceed, therefore, "on the issue of foreseeable future."

In the course of the termination hearing, Pierce acknowledged Mother had improved her circumstances, having no positive urinalysis tests, successfully completing drug and alcohol treatment, maintaining employment, having appropriate housing, and regularly attending visits with the children. But the State also presented evidence of Mother's continued contact with Father during his incarcerations between December 2017 and May 2018. The couple's conversations included texts and emails, phone or video calls, and Mother's video-recorded visits with Father. In some videos, Father called Mother vulgar names, yelled at her for not completing tasks he told her to do, and informed her that she was the reason he was in jail. Despite that treatment, Mother told Father she loved him and would continue to be there for him. After the State showed a

5

few videos in court, Pierce and Meinhardt stated their opinions that Father was at times emotionally abusive towards Mother. Pierce expressed his concern that Father had control over Mother from jail when he gave her to-do lists and became irate when she did not complete his lists. Meinhardt confirmed that a husband emotionally abuses his wife by calling her vulgar names, yelling at her for not getting his to-do lists done, and telling her who she can and cannot talk to.

Meinhardt told the court that she had recommended weekly therapy sessions but that Mother had asked to move therapy to every other week for financial reasons. She did not know Mother had provided Father financial assistance during his incarcerations. Meinhardt related that Mother's therapy focused first on domestic abuse but had recently started addressing codependency. She was unaware Mother had previously received therapy through Central Christian Counseling Center. According to Meinhardt, however, Mother had expressed a willingness to end her relationship with Father if it would help get the children back, although it would be hard. In January 2018, Mother told Meinhardt that Father was no longer welcome at her house. Meinhardt recommended that Mother continue therapy to address her codependency issues and was unsure how long that would be needed.

Pierce testified that he spoke with Mother in March and May 2018 about the importance of boundaries when it came to Father. Pierce said Mother denied that Father controlled her and told Pierce she and Father were only friends and not really in a relationship; she would not let Father move into the house upon his release, she could make good decisions without him; and she would not let him interfere in her life. Pierce testified, however, that Mother had said that before and she had allowed Father to move back home after his release in April 2017. Pierce stated he was uncertain whether Mother let Father move in after his later releases.

Pierce testified that Mother's codependency with Father was the priority concern when Mother stipulated to present unfitness and, two years later, it remained the principal issue. He confirmed that it was a concern that Mother would tell Father she loves him and would be with him no matter what when he is abusive towards her. Pierce also agreed that Mother had trouble putting the children first, but put Father, and "to an extent" herself, first.

The children's therapists also testified. Amy Meek, LSCSW, D.S.'s therapist, said she did not think it would be in D.S.'s best interests for Mother to be given additional time to work toward reintegration. Instead, it was in D.S.'s best interests to terminate Mother's parental rights and place him with Grandmother. Since entering therapy, D.S. had shown some improvement, including more appropriate interactions with Grandmother; he had begun to develop some healthy relationships; and he had shown more stability at school, at home, and with peers. Meek told the court that, from the few times she watched D.S. with his family, she saw him take on an almost parental role, with him evaluating the information he received from his parents before he decided whether to accept it. Meek said D.S. had grown up to be quite "parentified," at times wanting to act as parent to his younger sister and at other times tired of being the one to look out for her. And, as a 15-year old, he was not always going to make the best parenting decisions. Meek testified D.S. thought Father did not receive consequences for his actions and outsmarted or manipulated people. He was frustrated that Father had received limited prison time from his recent sentencing, and he believed Father would be released soon and would return to Mother. D.S. had told her he wanted to live with Grandmother, which he thought was the best place for him.

K.S.'s therapist, Lana Secrest, LSCSW, testified it was also in K.S.'s best interests to terminate Mother's parental rights and allow K.S. to live with Grandmother. Secrest had seen K.S. twice monthly from March 2016 to the time of the termination hearing. Secrest had observed K.S. become more trusting in therapy over time and she talked

more about past experiences, including witnessing some domestic abuse. Secrest stated her concerns with Mother's home environment were that K.S. had been a witness to domestic violence; that her brother—not her parents—may have acted as her protector; and that she was at times put in a place where she felt she had to choose between her parents. Secrest had only one direct contact with Mother, in her office lobby. Father had returned to jail and K.S. was crying and angry at him, but Mother failed to show compassion or to comfort K.S. Mother told K.S. that: "We're all mad at him. He did this to me, too." Then, in the presence of the children, Mother asked Secrest whether she had made a recommendation for the court and what that recommendation would be. Grandmother told Mother she should not do that with the children there. K.S. told Secrest that if she could stay with Grandmother, that is where she would like to be.

The State also presented the testimony of SFCS family support worker, Kaitlin Deitchler, who testified her role was to oversee visitations with the family and to work with the case manager to develop recommendations for the court. Deitchler testified that the visitations with Mother never advanced to the point they were unsupervised. Those visits had changed from supervised to monitored visits—during which a worker checks in during the visit—in January 2018, primarily because Father was in jail at the time. The visits reverted to supervised status after Grandmother reported that Mother tried to make a three-way phone call with Father to K.S.'s phone. When confronted, Mother denied it, but Meinhardt testified Mother admitted to her that she made the three-way call.

Deitchler was concerned that Mother seemed unable to use parenting skills and assert parental control when the children argued, and also that Mother continued to discuss with the children both their court case and Father's criminal cases despite having been told numerous times not to do so. Deitchler observed Mother's inability to exert any control over the children during a visit the day before the hearing. She also expressed concern with Mother's boundary issues with Father, explaining she was unsure Mother could protect herself and the children. Deitchler believed Mother put herself before the

children and her financial support of Father may not allow her to provide the care that the children need.

Mother had one witness testify on her behalf, Dr. Michael O'Donnell, senior pastor of Grace Baptist Church. O'Donnell testified he met Mother when Father was involved in their parenting class when he was in jail. O'Donnell met Pierce and went to see Mother to look at her needs, and he got her involved in a peer support system. He testified that the home where he and Pierce visited Mother was unsuitable, but once she found a new home, she set up her household well. Mother participated in the church's sober recovery program and became a leader and mentor in that substance abuse program.

O'Donnell testified he thought Mother knew "intellectually" she and Father needed to separate and they had recommended she have someone act "almost like a[n AA] sponsor" to help Mother follow through. Mother told him Father had talked about moving to another state upon his release from jail. O'Donnell told the court "I think if [Father] was not in the picture that they could have . . . a stable home." Having said that, O'Donnell added that whether Mother was capable of keeping Father out of the picture was a question about which he understood the "trepidation."

After the presentation of evidence, the district court found Mother previously had been found unfit based on her stipulation. The court said Mother had improved some of her circumstances, but held that her inability to end the relationship with Father—despite his continued abuse—supported finding her unfit and unlikely to change in the foreseeable future. From the bench, the district court identified the following factors in support of its finding: (1) abusive conduct towards the children under K.S.A. 2018 Supp. 38-2269(b)(2); (2) the failure of reasonable efforts by appropriate public or private agencies to rehabilitate the family under K.S.A. 2018 Supp. 38-2269(b)(7); (3) Mother's lack of effort to adjust her circumstances, conduct, or conditions to meet the needs of the children under K.S.A. 2018 Supp. 38-2269(b)(8); and (4) Mother failed to carry out a

9

court approved plan directed toward reintegrating the children into her home under K.S.A. 2018 Supp. 38-2269(c)(3). In the journal entry, the district court identified the same four factors and also identified K.S.A. 2018 Supp. 38-2269(b)(9) as supporting unfitness, that the children had been in extended out-of-home placement as a result of Mother's actions or inaction and one or more factors under subsection (c) applied. The district court held the termination of Mother's parental rights was in the children's best interests in considering the physical, mental, and emotional health of the children.

Mother timely appeals.

ANALYSIS

Mother argues the district court improperly considered the "stipulation to present unfitness" that she had signed two years before the final termination hearing. She contends the district court relied on that earlier stipulation to "waive findings of present unfitness," leaving the court without clear and convincing evidence to support its order for termination of her rights.

*Standard of Review*

When reviewing a termination of parental rights, we consider "whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (citing *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 [2008]). Evidence is "clear and convincing" when "the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. at 697. We do not "weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." 286 Kan. at 705.

When children have been adjudicated as children in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for [the children] and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). In making the determination, the district court considers nine nonexclusive factors listed in K.S.A. 2018 Supp. 38-2269(b). When the children are not in a parent's physical custody, the district court also must consider the four factors listed in K.S.A. 2018 Supp. 38-2269(c). Any one factor in K.S.A. 2018 Supp. 38-2269(b) or (c) may, but does not necessarily, establish grounds for terminating a parent's rights. K.S.A. 2018 Supp. 38-2269(f).

When we evaluate what constitutes the "foreseeable future," we do so "from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them." *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014); see K.S.A. 2018 Supp. 38-2201(b)(4).

"A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion) ('Parental unfitness can be judicially predicted from a parent's past history.')." *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018).

Upon finding a parent unfit, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2018 Supp. 38-2269(g)(1).

11

*Discussion*

Now, for the first time, Mother argues her 2016 stipulation of present unfitness created a rebuttable presumption that she overcame because the May 2016 stipulation was stale when, two years later, the district court found she was unfit and unlikely to change in the foreseeable future. In response, the State argues Mother failed to preserve the issue for review and her inadequate briefing should result in a finding by this court that she has waived or abandoned the issue.

Generally, issues not raised before the district court cannot be raised on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, Syl. ¶ 9, 266 P.3d 516 (2011). This includes constitutional grounds for reversal that have been raised for the first time on appeal. See *In re A.E.S.*, 48 Kan. App. 2d 761, Syl. ¶ 8, 298 P.3d 386 (2013).

> "'[T]here are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision.' [Citation omitted.]" *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008).

Mother has a fundamental constitutional right to the custody and control of her children, and this court has found consideration of an argument for the first time on appeal was necessary to prevent the denial of that fundamental right. See *In re K.L.B.*, 56 Kan. App. 2d at 438.

12

*The stipulation*

Although Mother styles her contentions as two issues, one of them with two subparts, they are essentially one argument—that the State failed to provide clear and convincing proof upon which the district court could base an order terminating her rights. Since the May 9, 2016 stipulation to present unfitness is central to her argument, we start there.

On May 9, 2016, the parties had appeared before the district court on the State's motion to find Mother and Father unfit and to terminate their parental rights. At that point, Father relinquished his rights and Mother stipulated to "present unfitness." In conjunction with Mother's stipulation, the other parties stated their agreement that Mother "will have a continuance of the termination hearing until August 8, 2016 . . . to allow her more time to complete court orders and demonstrate stability." The stipulation also included the statement that "all parties agree, that if this matter requires further hearing on the Motion in the future, the State will only be required to prove unfitness for the foreseeable future as to Mother." Over the next two years, there ensued a string of review and permanency hearings that ended with the full evidentiary hearing on the State's amended motion to terminate Mother's rights on May 16, 2018. Mother maintains that, on May 16, 2018, "she was not presently unfit," and that, two years after her stipulation, with "continuances requested and granted by the [S]tate," it was unreasonable to let the State rely on the stipulation.

If the stipulation had been adhered to according to its strict wording, Mother's argument might well be persuasive. At the outset of the 2018 termination hearing, the State announced, as a preliminary matter, "Mother did enter a stipulation to present unfitness on May 9th of 2016, so today's hearing is with regard to the issue of foreseeable future." If that were literally true, the State would be relieved of any obligation to present

13

evidence of events between May 9, 2016, and May 16, 2018, because the stipulation would act as something like a continuing admission of unfitness.

For a district court to enter an order for termination, K.S.A. 2018 Supp. 38-2269(a) requires both a finding "that the parent is unfit,"—present tense—and a finding that "the conduct or condition is unlikely to change in the foreseeable future." It is difficult to envision a situation in which the State could claim it had fulfilled its obligation to prove current unfitness *solely* through reliance on a parent's two-year-old stipulation that he or she was, at that time, unfit. And no circumstance comes to mind in which proof that the conduct or condition is "unlikely to change" would not rely substantially on evidence of the parent's complete history up to that time. Notwithstanding the statement about the May 9, 2018 hearing having *only* the foreseeable future as its subject, that is not how the hearing proceeded.

As we recounted above, the State's evidence was not at all limited to opinions about Mother's prospective fitness as a parent for D.S. and K.S. Instead, it provided an expansive review from the time the stipulation was made. This included both an acknowledgment of her accomplishments and descriptions of the times she failed to show progress.

The stipulation to present unfitness appears to be a nonstatutory creation, devised to relieve the State at a future hearing from recalling witnesses and presenting evidence that would have been offered had the stipulation not been made. When used that way, as a marker describing the circumstances on a particular date, rather than as a rolling admission of unfitness for each "present" date thereafter up to a final hearing, we see no prejudice to a parent's rights. Here, since the State did provide evidence about the case between the date of the stipulation and the final hearing and did not rely on the stipulation as conclusive for present unfitness on May 16, 2018, Mother's argument fails.

14

*Clear and convincing evidence*

We must consider next whether the district court had evidence it could properly consider to be clear and convincing in support of the statutory requirements for termination that we noted above. Again, at this stage, we decide "whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated." *In re K.W.*, 45 Kan. App. 2d at 354. We need not detail the considerable evidence before the district court, but we will point to that court's conclusions and some of the evidence upon which the district court was entitled to rely.

At the end of the hearing, the district court ruled from the bench. After recognizing that Mother had progressed in some areas, the court said that, since 2016, Mother had had a chance "to deal with the most important issue in this case": her relationship with Father. The district court highlighted the video recordings of contacts between Mother and Father while he was in jail and pointed out that most had occurred not long before that hearing. The court concluded that:

> "the one thing that stands out to me is it doesn't matter what [Father] does, [Mother] will do anything to maintain this relationship. It doesn't matter how verbally abusive he is, she will do anything to maintain this relationship. But the biggest concern I have is that whenever these two children are exposed to [Father] and [Mother] and see[] their interaction between each other, D.S., in particular appears to be modeling his father's behaviors. And, obviously, it's not good for their daughter to . . . see that, because, obviously, there's . . . a risk that she will see how her mother reacts to those situations and will potentially seek out relationships that put her in a codependency . . . like her mom has been on during the duration of her relationship with [Father]."

15

When it arrived at those conclusions, the district court had the evidence that in May 2016 Mother stipulated that Pierce's court report provided a factual basis for her acknowledgment of present unfitness. Within that report, Pierce stated that he met with Mother in August 2015 and observed she had broken fingers and two black marks under her eyes. Mother admitted there was domestic violence with Father. But Mother told Pierce she felt safe in her home because Father was no longer welcome there and she did not plan to have him return. Almost three years later, the court saw recent evidence of the state of that relationship from the videos and heard that Mother had provided financial support to Father while he was incarcerated. The State also presented evidence at the termination hearing that K.S. had discussed with her therapist witnessing domestic violence and identified D.S. as her protector, while D.S. at one point expressed to his therapist that he had grown tired of looking out for K.S.

Mother participated in individual therapy addressing the effect of domestic violence on families, but the evidence showed that Mother's full investment in the counseling was subject to question. In her report that was admitted into evidence, Hernandez stated that toward the middle of her sessions with Mother, it became clear Mother had omitted important information about Father and his pending criminal trial. Hernandez said Mother's lack of transparency made it difficult for her to know whether Mother was in a state of denial and unable to see how her marriage could negatively impact her children. Hernandez wrote that she told Mother and Pierce about her agency's decision to refer Mother to another agency "as [Mother] exhibited little interest in processing the unhealthy marriage in detail with [Hernandez] and would most likely need long term therapy for her concerns."

It took about eight months for Mother to follow up on that referral, again raising questions about her commitment to that process. Then, during Mother's intake appointment at HopeNet, she expressed that she was there to fulfill the court requirement for her to receive counseling and to discuss her relationship with her husband so she

16

could regain custody of her children. After one of her first meetings with Mother, the HopeNet therapist, Meinhardt, noted Mother had confusion about why therapy was required. Meinhardt further testified that Mother failed to tell her about the multiple therapy sessions she had with Hernandez at Central Christian Counseling. And Pierce testified that while Mother could state her understanding that she needed therapy to address her relationship with Father, he thought she minimized that issue, and he "really did not believe that she thought it was the issue that we thought [it] was."

Mother's witness, Dr. O'Donnell, testified that after her stipulation, she understood her codependency issues with Father were a main issue in the case, and he provided some counseling to her. O'Donnell saw some of the videos presented during the hearing and agreed they showed very abusive behavior by Father, and that Mother was "not healthy." He characterized Mother's response to one of Father's actions, involving Father's girlfriend, as "bizarre," and also testified he was aware that Mother had not been truthful about her relationship with Father.

The district court specifically mentioned the evidence of the couple's interactions during Father's incarceration that showed Mother continued to have trouble interacting with Father in a healthy way. Some videos showed Father verbally or emotionally abusing Mother and, despite the abuse, she would tell Father she loved him and would be there for him. Meinhardt told the district court her recommendation for Mother was to continue with therapy to address her codependency issues, but she had no idea how long it would take to complete that work.

In its statement from the bench, the district court found that: (1) Mother had condoned behavior in her home that had a detrimental effect on the children, constituting emotional abuse; (2) reasonable efforts by the agencies had failed to rehabilitate the family because of Mother's failure to address her relationship with Father and that relationship had directly affected the children; (3) Mother had shown a lack of effort to

17

adjust her circumstances, conduct, or conditions to meet the needs of the children; and (4) Mother had failed to carry out a reasonable plan approved by the court to reintegrate the children into her home.

In support of those findings, the district court pointed to the existence of Mother's unhealthy relationship with Father, the adverse effect of the relationship on the children, and Mother's failure to take action to alter the situation to protect her children. The court also focused on the need to move to permanency, considering the duration of the case and difference in the way adults and children perceive time. The case had been open for almost three years and the court saw no evidence that Mother would undertake the work on her relationship with Father that would be needed for reintegration.

In her brief, Mother declares she agrees that the time had come for permanency so, in that sense, she does not challenge the district court's best interest finding. She argues, however, that the district court's decision lacked specificity on both present and future unfitness. We disagree. The district court conceded that Mother had made progress in some areas. Progress in those areas was important and, in many other child in need of care cases, might have been critical to reintegration. But the obstacle to reintegration here was not continued drug use, stable housing, or employment, but the detrimental environment into which the children would be returned. The court was clearly persuaded by the evidence that there was no reason to believe Mother would not accept Father back into her home after he was released from prison several months after the termination hearing. Mother's failure to engage meaningfully in therapy over the previous two years included an eight-month hiatus, corroborating Pierce's belief that Mother might say she understood the importance of addressing the relationship issues, but she did not really accept it as a problem.

Mother also contends termination for the reasons stated by the district court is inappropriate because she "was not told that her reintegration [was] hanging in the

18

balance unless she completely terminate[d] her relationship with her husband." She also maintains that SFCS sent mixed signals because it worked with Father as a significant other following his release from jail in 2017. Mother claims SFCS had made that a "secret" key to reintegration.

A district court should not direct a parent to divorce a spouse, or "completely terminate" their relationship with a spouse, and it does not appear the district court did that here. That is a very different matter, however, from the court and the responsible agencies tasking a parent with addressing an unhealthy relationship that has negatively affected the children. We admit we see inconsistency in the decision by SFCS to engage with Father to the point of opening the possibility of visits *after* he relinquished his parental rights and *while* SFCS was pressing mother to address her codependency with him.

Nevertheless, Mother's claim that she was in the dark about the importance of seriously engaging on the nature of her relationship with Father is disingenuous. The evidence before the district court showed that was a concern that was raised multiple times, from different sources, in various contexts. If anything, Mother's argument echoes Pierce's statement about her saying the right things, without the commitment to do them.

The district court had ample evidence to draw from for its findings of present unfitness and the unlikelihood of change in the foreseeable future. The district court also had the evidence to back its finding that termination was in the best interests of D.S. and K.S. The evidence was consistent, clear, and convincing. We find no error by the district court.

Affirmed.